MONROE, C. J.
Plaintiff, by separate instruments in writing of date November 26, 1912, purchased from the defendants in the above-entitled suits, respectively, “all merchantable pine timber” standing on certain tracts of land owned by them in De Soto parish, paying (at the rate of $3.50 per estimated I,000 feet) an aggregate price of $10,500, of which $2,500 was paid in cash, and the balance by notes maturing at various dates from March, 1913, to June, 1914, inclusive. In October, 1913, several of the notes having matured and being unpaid, defendants caused writs of seizure and sale to be issued to enforce their payment, and thereupon the defendant in those proceedings (plaintiff here) instituted these suits, enjoining the •execution of the writs, and praying that the contracts upon which they were predicated be rescinded, and that he have judgment for the repetition of the cash paid by him and for damages, to which defendants made their answer, the eases were consolidated, and, after the hearing of evidence and argument, were decided adversely to plaintiff, who now prosecutes this appeal.
He alleges, in substance, that the two sales represented but a single transaction, the object of which, so far as he was concerned, was to acquire 3,000,000 feet of timber in a body; that defendants, being made aware that a smaller quantity would not answer his purposes, assured him that there were .more than 3,000,000 feet upon the tract in question, and that he was thereby induced to enter into the contracts for its purchase; that subsequently, in March, 1913, he discovered that he had acquired less than the quantity stated, and that he had been misled by defendants’ false and fraudulent misrepresentations, wherefore he prays for judgment, etc.
It appears from the evidence that the defendant Hale owned part of See. 6, T. 10 N., R. 13 W.; that his nephews and nieces, the Harris heirs, owned adjoining tracts, and that.it was thought advisable to offer the timber for sale in a body; that G. H. Harris, acting for his uncle, brothers, sisters, and himself, accordingly placed the matter in the hands of J. D. Pace, a broker in Alexandria, who entered into negotiations with plaintiff, as the result of which, on Sunday, November 17, 1912, plaintiff, accompanied by Harris, went to Hale’s residence, on the land in question, and he and Hale rode over the land and zigzagged their way through the timber, from 9 o’clock in the morning until about 2 in the afternoon, in order to give plaintiff an. opportunity to determine whether, the quantity and general situation considered, the timber would suit him at the price at which it was offered, or whether it would be worth his while to look further, into the matter. Plaintiff, according *151 to his own testimony, has been in' the sawmill business since he was a boy (and he is no longer a young man), knows timber “from the ground to the mill,” and is a competent estimator. Hale is a farmer, whose only knowledge of timber estimating, or any other branch of the timber business, has been derived from casual conversations which he has heard or has been engaged in between or with timber dealers and speculators, and from which he has received the impression that timber lands in his neighborhood should yield from 4,000 to 6,000 feet of timber to the acre, and hence that the 740 acres owned by him and the Harris heirs should yield, in the aggregate, 3,000,000 feet, or more. The Harris heirs do not live in that part of the state, and know nothing about timber or timber deals, and their brother and agent (who is one of the heirs) is a railway mail clerk, and has been for 16 years, and is as innocent of such knowledge as his brothers and sisters. "When plaintiff had completed the “cruise” (as his .expedition through the timber is called), he stated that he was pleased with what he had seen, and, as we infer, was rather in doubt whether it would be necessary for him to send an estimator to confirm the impression that he had received as to the quantity of timber. Within the week following Harris telephoned to him asking what conclusion he had reached, with the result that an appointment was made for the closing of the contract at Pace’s office, in Alexandria (as plaintiff seems to have understood), on the following Sunday (November 24th), and plaintiff went to Alexandria on that day for that purpose. But there was some misunderstanding as to the appointment, and he returned to his home or mill in another parish, leaving a power of attorney to some third person to act in his stead. The power of attorney was defective, however, and, upon Hale’s arrival in towp on the following day (Monday), it was decided that plaintiff should be requested to' return and attend to the business himself, which he did, and the contracts were signed, the $2,500 paid, and the notes delivered on Tuesday (November 26th). Thereafter, in May, 1913, plaintiff shipped part of his mill machinery to the locus in quo, after which he had some conversation with Hale and Harris in which he proposed that they go-into partnership with him in the sawing of the timber in question and the selling of the lumber, representing that it would be a paying business, which proposition they declined. He then tried to sell the timber to a third person; and about that time, or perhaps later, he stated to Hale that he felt satisfied that there were not more than 2,-500,000 feet of timber on the land, and proposed to sacrifice $1,500 of the cash that he had paid if the vendors would let him out of the transaction and cancel his notes. Hale testifies that he told plaintiff that he did not think that he had said anything to deceive him as to the quantity of timber, and that plaintiff replied that:
“He didn’t mean that; that he was deceived with his own eyes; that his own eyes had deceived him.”
In the meanwhile, as appears from testimony that is wholly unchallenged, a change had taken place in the lumber market, which, being “at the very best in November and December, 1912,” had “slumped” to the extent of $5 per 1,000 feet by the summer of 1913, the decline having begun in the spring; and, when the month of October arrived, and defendants foreclosed upon their unpaid notes, plaintiff appears to have reached the conclusion that he had been imposed on, and brought this suit, with an injunction against the foreclosure. We are of opinion that the evidence adduced by him fails to sustain the allegations upon which he relies. It fails to show that he did not acquire 3,000,900 feet of timber from defendants, and equally fails *153 to show that defendants, or either of them, represented or guaranteed that he would acquire that quantity. Plaintiff placed two witnesses on the stand who testified, the one, that he had estimated the timber on the 300 acres in section 6 (he was unable to say whether in 1911 or 1912) in the interest ■of a lumber company which contemplated making an offer for it, and that he found 1.250.000 feet, the other, that he had estimated- the timber on the other 440 acres between 8 and 12 o’clock on the Saturday prior to the ■day upon which he testified, and had found 491.000 feet. Part of the cross-examination •of this witness reads as follows:
“Q. What rule do you use in estimating, Doyle’s or Scribner’s, or do you use them in combination? A. Well, I don’t use either one. I have a Doyle’s book that I learned from; of course, you don’t scale while estimating. Q. Do you use that in estimating? A. Yes, sir; I use those rules. Q. Do you take the diameter •of the trees? A. Yes, sir; while I don’t measure the trees. Q. You get the approximate •diameter, and their approximate height? 1 A. Yes, sir. Q. Well, take a tree 28 inches in diameter, in timber that would cut out a log 28 feet in length; what is the quantity of feet in that tree; suppose you state to me your rule? A. Why, I take the diameter, but I don’t remember the rule. Q. What is the rule that is used — given the diameter and the height —what is the rule used to get at the quantity? A. Why, I don’t know that I could state it. Q. Can you give me the Scribner’s or Doyle’s, or the combination of the two? A. I don’t know that I could do that.”
And he nowhere explains the method, if he had one, by which he made his estimate.
Defendants’ estimator qualified by testifying to the work that he had done for 12 ■different lumber companies and under appointments from courts, and by explaining how the work is done, and he further testified that he had spent two days in estimating the timber here in question, and had found .an aggrega’te of 3,245,000 feet. Plaintiff himself, who professed to be an expert, and who had had all the time from November 26, 1913, to March 20, 1914, when the ease was tried <in addition to that consumed in the “cruise” with Hale) for the making of an estimate, testified in part as follows:
“Q. Did you ever estimate that timber? A. Yes, sir; I have since [he had previously testified that he made no estimate while on the cruise], Q. Well, did you- estimate it thoroughly? A. I was sick when I got over here, and' I hired a man to construct it [meaning the mill] for me; but I stayed there during the construction of the mill. Later on I went out to look over it, and I looked over the timber; then I stopped work and went to Mr. Pace and told him 1 found the timber did not measure up; that it was not there; and I wanted to compromise the proposition. Q. That wa§ in the month of May? A. That was in June, I think; in the last of May or the first of June. Q. It was then that you discovered for the first time that there were not 3,000,000 feet of timber there? A. Yes, sir. Q. Did you look at it yourself? A. Yes, sir.”
And that was as near as he came to answering the question:
“Well, did you estimate it thoroughly?”
It is conceded that plaintiff cut 20,000 feet of the timber after his purchase, and Hale testified, without attempt at contradiction, that it was cut from less than 2% acres of land, which (even if it were cut from full 2y2 acres) would give 8,000 feet to the acre, though it is probable that the particular acres from which the cutting was done were more heavily wooded than the average. Considering the whole testimony, however, that adduced by defendants as to the quantity of timber is quite as convincing as the other, and plaintiff therefore fails to make out his case. The same thing, and more, may be said of the representations that defendants are alleged to have made to the effect that Hale had had the timber estimated by a competent man and that he produced such an estimate, showing more than 3,000,000 feet of timber, on the day that the contracts were signed. The testimony given by plaintiff upon that subject is confused, and cannot be made to harmonize with the plain facts and probabilities of the case or with itself. He testifies positively that at the first meeting *155 between Harris, Pace, and bimself there was nothing said by either of them which tended definitely to fix the quantity of timber that was to be included in the deal. He then tells of his ride with Hale around, through, and across the timber, a '“cruise” of 8 or 9 miles, which occupied them from 9 o’clock in the morning until noon (Hale says until about 2 o’clock p. m.), and says that he told Hale that he was pleased with what he had seen. He was then asked by Ms own counsel if that was all that was said about the timber, and he replied that he thought it was, “except just ordinary talk”; to which, by way of further answer, he added that he told them that he could not then estimate the timber, and that his purpose was to ascertain whether it would be worth his while to send an estimator, or return himself and make an estimate. He then testifies that he received a telephone message a’ few days later from Harris, telling him that his uncle had had an estimate made by a competent man, and suggesting that it was unnecessary that he should waste time and money in having another one made; that thereupon he attended a meeting at Pace’s, office, where Hale produced a bunch of letters and papers, and upon one piece of paper either found, or himself wrote down, some figures which he said was. an estimate; that witness made no inquiry as to when the estimate had been made, or by whom, did not take the paper into his hands, and did not know what became of it, but that he thereupon signed the contracts, paid the $2,500 cash, and executed the notes. On one page of his cross-examination he says that the telephone message was the first intimation that he received that the timber had been estimated. On the next page he was asked whether Hale had said anything upon that subject when they were riding through the timber, and he replied and further testified as follows:
“My memory serves me that he did. He said some one wanted to buy it and estimated part of it. He said that the estimates were too little for him to consider. He didn’t give me the figures. * s: * Q. Did he tell you that they had been made by him, or for him or some one else? A. He said it had been made by Frost-Johnson Lumber Company’s estimator, when they wanted to buy it. Q. For purposes of their own? A. Yes, sir. * * * Q. Did he tell you all this when he was in the woods? A. I don’t remember whether he did or not. Q. You say that he had told you that he had had it estimated, but would not give you the amount because it was incorrect? A. That was on one piece. Q. That was the one that was estimated by the Frost-Johnson Company’s estimator? A. Yes, sir; that was just one piece. Q. Did he go farther and state to you that he had had part of it estimated himself? A. Yes, sir. Q. That was out in the woods? A. Not at that time; I don’t know whether he told me on that trip — whether he told me or not — that any part had been estimated, but later on he did. Q. Then, when M'. Harris telephoned to you that his uncle had estimates, it was not news to you? * * * Q. Your answer to that is that it was news as to part, but not news as to the Frost-Johnson estimate? A. Yes, sir. Q. Then one of the estimates produced when you were about to close the sale was this old repudiated Frost-Johnson estimate? A. Yes, sir; that was one part of it; I took it for granted that part of it was the Frost-Johnson estimate.”
At another place in Ms cross-examination we find the following:
“Q. Now, what did you finally buy this timber on — the statement of this unknown estimator and the Frost-Johnson estimator, or your own observation? A. Yes, sir; on the statements of Mr. Hale. Q. That was the only information you had? A. No, sir; just from what I had seen of the country, and from what I presumed to be the average of the timber.”
Hale and Harris deny that any estimates were produced or that anything was said about estimates at the time of the closing of the contracts, and Pace, in whose office the transaction took place, though he speaks of a paper that Hale had, and that he (Pace) did not examine, gives the following, with other testimony, to wit:
“Q. I understand your statement to be that, when they came to your office, they seemed to come with the understanding that there were about 3,000,000 feet of timber on these tracts? A. Yes, sir.”
As a matter of fact, Hale never had any estimate made until shortly before the trial *157 of the case, and it seems improbable that he should have pretended to have done so when it was open to plaintiff to ask for the estimate and for the name of the maker; also improbable because Hale is shown to be a man of good character and fair estate, who has lived where he now lives all of his life, and enjoys the respect of his neighbors. Moreover, the Frost-Johnson estimate, which plaintiff says that Hale had discredited, relates to the tract containing much the larger proportion of the timber, and it was unreasonable for plaintiff to have assumed that Hale, who had repudiated it several years before, had suddenly concluded to adopt it.
Upon the whole our conclusion is that the evidence fails to show that defendants, or either of them — being persons wholly unacquainted with the timber business — made any representations which should have influenced, or did influence, plaintiff, a lifelong dealer in timber and an expert in that business, in the matter of his entering into the contracts out of which this litigation has arisen, and we find no reason, either in law or equity, for relieving him of the obligation which he voluntarily, with ample information, opportunity for information, and a view to his own profit, chose to assume.
The judgment appealed from is therefore affirmed.